**REEBOK INTERNATIONAL LTD. (a Massachusetts corporation) and Reebok International Limited (a limited company of the United Kingdom), Plaintiffs,**

v.

**MARNATECH ENTERPRISES, INC., Conatech, S.A. De C.V., Nathan Betech; Various John Does, Jane Does and ABC Companies, Defendants.**

Civ. A. No. 89–1361–GT (CM).

United States District Court,
S.D. California.

Sept. 28, 1989.

Neil A. Smith, Limbach, Limbach & Sutton, San Francisco, Cal. (Harley I. Lewin, Bart A. Lazar, Lewin & Laytin, P.C., New York City, of counsel), for plaintiffs.

## FINDINGS AND CONCLUSIONS AND ORDER FOR A PRELIMINARY INJUNCTION

GORDON THOMPSON, Jr., Chief Judge.

Plaintiffs, Reebok International Ltd. and Reebok International Limited, originally moved *ex parte* on September 12, 1989, for a temporary restraining order, seizure order and order to show cause for a preliminary injunction under the Lanham Act (15 U.S.C. § 1051, *et seq.*), as amended by the Trademark Counterfeiting Act of 1984, Public Law 98–473, and the laws of the State of California, for the reason that defendants appear to be selling and dealing in footwear bearing counterfeits of plaintiffs' registered REEBOK, STARCREST Design and STRIPCHECK Design trademarks (hereinafter collectively the "Reebok Trademarks"). The Court having granted the requested Temporary Restraining Order and Order to Show Cause on September 12, 1989, and the defendants having been served with the pleadings and the Court having heard the arguments of counsel Neil A. Smith of Limbach, Limbach & Sutton and Harley I. Lewin of Lewin & Laytin, for the plaintiffs, and Arthur Holz of Charmasson & Holz for defendants Marnatech Enterprises, Inc. and Nathan Betech, on September 22, 1989, and defendant Conatech S.A., not having appeared on the date set for hearing on the Order to Show Cause, and the Court having reviewed the memoranda, declarations and exhibits filed by both parties, the court makes the following findings and conclusions:

■ "To obtain a preliminary injunction, a party must demonstrate either (1) a combination of probable success on the merits *and* the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions pointing to the merits and that the balance of hardships tips sharply in its favor." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir.1987), *citing, Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir.1985); *Apple Computer, Inc. v. Formula Int'l. Inc.*, 725 F.2d 521, 523 (9th Cir.1984).

Defendants' main objections relate to the jurisdiction of this Court over defendants' acts outside the United States and defendants argue that plaintiffs have not established that defendants are selling shoes bearing counterfeits of plaintiffs' REEBOK trademarks. For the reasons and based upon the authorities and conclusions later cited, the Court makes the following findings and Order:

(a) Plaintiffs are likely to succeed on the merits in showing that defendants are using counterfeits or infringements of the Reebok Trademarks, registered on the Principal Register in the United State Patent and Trademark Office, in connection with the importation, exportation, transshipment, sale, offering for sale, and/or distribution of footwear and/or other merchandise; and that

(b) Defendants' importation, exportation, distribution, transshipment and sale of such merchandise bearing counterfeit duplications of one or more of the Reebok Trademarks is likely to result in an immediate and irreparable injury to plaintiffs if an injunction is not issued to restrain such acts; and that

(c) The harm to plaintiffs of denying the requested preliminary injunction outweighs the harm to the legitimate interests of defendants from denying granting such an order; and that

(d) The equities weigh heavily in favor of plaintiffs whose valuable trademarks and reputation are at risk through the counterfeiting activities of defendants.

Plaintiffs commenced this action by the filing of a summons and complaint on September 12, 1989 under the Trademark Act

of 1946, 15 U.S.C. § 1051 *et seq.* as amended (hereinafter the "Lanham Act") alleging, *inter alia*, that defendants were engaged in the manufacture, sale, distribution, and resale of counterfeit REEBOK footwear.

It clearly appears from the evidence presented that defendants are individuals and corporations, residents and/or citizens of the United States which are doing business in this district in the sale and distribution of counterfeit REEBOK footwear in Mexico such as the Tijuana border town, from offices located in San Diego in this district.

Defendants have sought to avoid the consequence of their actions by arguing that they ultimately deliver their counterfeit shoes just outside the United States border, primarily in Mexico. It appears that defendants at least organize and direct the manufacture of counterfeit shoes from the United States. Defendants receive the money from their sales of counterfeit shoes in the United States and wire money to what appears to be the manufacturers of the counterfeit shoes in Korea from the United States. Defendants also appear to know their counterfeit goods went back to the United States with regular frequency, counseling plaintiffs' investigators to be careful, that it "was dangerous" and to "watch out for U.S. Customs". The foreseeability of injury in the United States from defendants' acts favors application of the Lanham Act and issuance of an injunction.

Based upon information supplied by plaintiffs, it appears that the Mexican Federal Judicial Police arrested defendant, Nathan Betech, and raided defendants' Mexican warehouses and charged those arrested with tax evasion, trademark and copyright counterfeiting and other crimes. The reference to this proceeding in Mexico is made because defendants have raised it. This Court, in granting this Order, does not rely upon, or intend its Order to influence that proceeding, which will be governed solely by and under Mexican law.

Defendants argue that the preliminary injunction ought not issue because the counterfeit goods were solely for delivery in Mexico and that they did not deliver the goods physically in the United States, and that they believed the goods to be genuine.

However, plaintiffs' investigators' declarations show that defendants knew and advised plaintiffs' investigators that, the REEBOK shoes they were selling were counterfeit; defendants participated and directed the purchase of the counterfeit shoes from their offices in San Diego; offered to sell the shoes in the United States (although the deals were to require physical delivery outside); defendants appear to have known the counterfeit goods were to be re-imported into the United States; conducted their financial affairs from the United States; and defendants appear to have sought to use the United States as a safe haven for their activities. Defendants' own declaration of defendants' secretary who works in this district in San Diego acknowledges that she is involved here in San Diego in the "administration of [the defendant Marnatech] and all matters of paperwork and communications."

■ The Supreme Court unequivocally has stated that the Lanham Act provides a "broad jurisdictional grant," *Steel v. Bulova Watch Co., Inc.*, 344 U.S. 280, 286, 73 S.Ct. 252, 256, 97 L.Ed. 319 (1952) (hereinafter *"Bulova"*), that extends to "all commerce which may lawfully be regulated by Congress." *Id.* at 284, 73 S.Ct. at 254, *quoting*, 15 U.S.C. § 1127. Therefore, "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." *Id.* at 286, 73 S.Ct. at 255 (citation omitted).

The plaintiffs own and control the federally registered trademark REEBOK for,

*inter alia,* footwear, in the United States and have registrations therefore in Mexico. This has not been questioned by defendants and must therefor, for the purposes of this motion be accepted as true. Plaintiffs have established that they are the only authorized sellers of genuine REEBOK footwear in the United States and Mexico. It appears that each sale of genuine REEBOK footwear within these two countries, is directly reflected in the American plaintiffs' revenues. The harm done by defendants to plaintiffs' income and the commerce of the United States may be great.

Various circuits have recognized the Supreme Court's view of the "sweeping jurisdictional language" of the Lanham Act. *Wells Fargo and Company v. Wells Fargo Express Company,* 556 F.2d 406, 427, 194 USPQ 10, 26 (9th Cir.1977) (hereinafter *"Wells Fargo"*), citing, *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976) (hereinafter *"Timberlane I"*). *Accord John Walker and Sons, Ltd. v. DeMert & Dougherty, Inc.,* 821 F.2d 399, 408, 3 USPQ.2d 1001, 1008 (7th Cir.1987) (the *Bulova* Court upheld a "broad concept of commerce" under the Lanham Act); *American Rice, Inc. v. Arkansas Rice Growers Cooperative Association,* 701 F.2d 408, 413 (5th Cir.1983) (hereinafter *"American Rice"*) (the *Bulova* Court held that the "Lanham Act revealed a Congressional intent to exercise its power to the fullest"). The Lanham Act imposes upon this Court "the duty to protect the entire gamut of purchasers, including non-English-speaking purchasers, in various countries throughout the world to which the defendants intend to export their WILSONS cigarettes." *R.J. Reynolds Tobacco Co. v. Virginia Int'l Export, Inc.,* 220 USPQ 712, 715 (E.D.Va.1982) (granting preliminary injunction to plaintiff owner of trademark WINSTON for cigarettes against defendants' sales of WILSONS cigarettes outside the United States).

Under the Lanham Act, it is an act of trademark infringement, *inter alia,* to "use in commerce an reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertis-ing of any goods ... in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ..." 15 U.S.C. § 1114(1)(a).

■ It appears that defendants' activities in the United States were the controlling force behind their Mexican distribution of counterfeit REEBOK footwear. These acts appear as "essential steps in the course of business consummated abroad; acts in themselves legal lose that character when they become part of an unlawful scheme." *Bulova, supra,* at 287, 73 S.Ct. at 256. Moreover, "Congress has the power to prevent unfair trade practices [even] in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." *Id.* at 286, 73 S.Ct. at 255.

In a parallel case brought by plaintiffs where the defendants dealt in counterfeit REEBOK footwear between Taiwan, Singapore and Japan, the District Court for the Central District of California found that it had jurisdiction over the defendants under the Lanham Act by reason of defendants' activities in financing and directing their counterfeiting activities from the United States. *Reebok International Ltd. v. American Sales Corp.,* 11 USPQ.2d 1229 (C.D.Cal.1989) citing *Wells Fargo* and *Bulova. Timberlane Lumber Co. v. Bank of America National Trust and Savings Association,* 749 F.2d 1378 at 1383 (9th Cir. 1984), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985) (hereinafter "Timberlane III"). Even though no shoes entered the United States the defendants, as in this case, were residents of California, subject to the state's jurisdiction and orchestrated their counterfeiting shoes activities from California.

To the extent that defendants argue that their counterfeiting activities occurred in Mexico and were allegedly entirely outside the territory of the United States, the "jurisdictional rule of reason" outlined by the Ninth Circuit in *Timberlane I, supra,* would still confirm that the Lanham Act would be and should be applied to such acts. Although *Timberlane I* involved an-

titrust rather than trademark law, its jurisdictional analysis has been held by this Court to be applicable to the Lanham Act. *See, e.g., Star–Kist Foods, Inc. v. P.J. Rhodes & Company,* 769 F.2d 1393, 1395, 227 USPQ 44, 45 (9th Cir.1985).

*Timberlane I* enumerated three requirements for jurisdiction under the Lanham Act:

> [F]irst, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statutes; and, third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority.

*Id.* 769 F.2d at 1395, 227 USPQ at 45, *citing, Timberlane I, supra,* 549 F.2d at 613–15. Analysis of these requirements demonstrates this Court's subject matter jurisdiction.

The *Timberlane I* Court required only that "there be *some* effect—actual or intended—on American foreign commerce before the federal court may legitimately exercise subject matter jurisdiction...." *Timberlane I, supra,* 549 F.2d at 613 (emphasis supplied). ("We agree with the Ninth Circuit that *Bulova* contains no ['substantiality'] requirement, and that *some* effect may be sufficient").

As the court noted in *American Rice, supra,* the sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction ("unlawfully selling its products in Saudi Arabia, [the defendant] diverted sales from [the plaintiff].... Merely because the consummation of the unlawful activities occurred on foreign soil is of no assistance to the defendant.") *Id.* at 414–415.

Thus, even ignoring the focus of defendant's counterfeiting scheme within the United States, taking note of the fact that genuine REEBOK shoes are sold in Mexico and throughout the world and that the American plaintiff derives direct income from such sales, the sale of counterfeit merchandise in Mexico by defendants sufficiently affects United States commerce. Not only does it appear that plaintiffs suffer the direct loss of income suffered from the sales of counterfeit goods in Mexico, such sales offend the provisions of the Lanham Act more than the minimal amount required under *Timberlane I* requirements. Such activities, for example, may divert plaintiffs' genuine Mexican sales, decrease the value of the American plaintiffs' consolidated holdings and damage the American plaintiff directly when these goods find their way into the United States.

In *Ramirez & Feraud Chili Co. v. Las Palmas Food Company,* 146 F.Supp. 594, 597, 598 (S.D.Cal.1956), *aff'd per curium* 245 F.2d 874 (9th Cir.1957) *cert. denied,* 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958) (hereinafter *"Ramirez"*) this court took note of the common practice of residents of the border towns on the American side to travel to Tijuana to buy goods and bring them back, that such transactions directly affected plaintiffs' good will not only in Mexico but in the United States. *Id.* The court extended the Lanham Act and imposed liability on "foreigners owing no allegiance (to the United States), for acts done which proximately cause damage within the territorial limits of the sovereign" *Id.* at 600. This appears to be true in the instant matter as well.

The *Ramirez* decision makes it clear that the court can enjoin trademark counterfeiting by U.S. residents in both the U.S. and the Republic of Mexico, and that defendants' activities there are subject to jurisdiction here. *Ramirez, supra.*

■ The application of the Lanham Act and issuance of a preliminary injunction is mandated here in light of the elements enumerated by the *Timberlane I* Court, *supra,* 549 F.2d at 614, weighed in the analysis of whether the interest of the United States *vis-a-vis* other nations be sufficiently strong to justify the assertion of jurisdiction. As the court noted:

> [a] the degree of conflict with foreign law or policy, [b] the nationality or allegiance of the parties and the locations or principal places of business of corpora-

tions, [c] the extent to which enforcement by either state can be expected to achieve compliance, [d] the relevant significance of effects on the United States as compared with those elsewhere, [e] the extent to which there is an explicit purpose to harm or effect American commerce, [f] the foreseeability of such effect, and [g] the relevant importance to the violations charged of conduct within the United States as compared with conduct abroad.

This Court's assertion of Lanham Act jurisdiction here does not conflict with the law or policy of any nation. Plaintiffs own and control their REEBOK trademark in Mexico. Questions of infringement of the Mexican trademark will be litigated in the Mexican courts.

The Fifth Circuit noted that an American company's foreign commerce is directly applicable to the jurisdictional question:

> Absent a determination by the Saudi court that [the defendant] has a legal right to use the marks, and that those marks do not infringe [the plaintiff's] mark, we are unable to conclude that it would be an affront to Saudi sovereignty or law if we affirm the district court's injunction prohibiting the defendant from injuring the plaintiff's Saudi Arabia commerce conducted from the United States.

*American Rice, supra,* 701 F.2d at 415–416, *citing, Ramirez & Feraud Chili, supra.* Since to this Court's knowledge there has been no adjudication on the merits in the Mexican courts, there is no danger at this time of this preliminary injunction interfering with the laws of a foreign nation.

In the instant case each of defendants is an American citizen, national or corporation and/or resides in the United States. Additionally, each of plaintiffs' investigators and other witnesses are American citizens and reside in the United States. The plaintiffs' and defendants' offices and records are located in the United States as are most potential witnesses. Therefore, the citizenship of the parties and witnesses weighs heavily in favor of the exercise of jurisdiction. *See, Timberlane I, supra,* where the Ninth Circuit found that all named parties except one were United States citizens or nationals but "all of the crucial percipient witnesses to the incidents were either Honduran citizens or residents." *Timberlane III, supra,* 749 F.2d at 1384. Nonetheless, the Ninth Circuit found that "the citizenship of the parties was slightly in favor of the exercise of jurisdiction." *Id.*

A judgment against the instant defendants could easily be enforced *only* in this United States Court, in the District where defendants reside, maintain their homes, bank accounts, assets and where the defendants appear to have orchestrated their counterfeiting activities. Therefore, while this element tipped "slightly in favor of the assertion of jurisdiction" in *Timberlane III, id.,* it weighs heavily in favor of the assertion of the Lanham Act jurisdiction in this case. Even beyond their offer for sale of counterfeit REEBOK goods to buyers in the United States, defendants' sale of counterfeit REEBOK goods in Mexican border towns harms plaintiffs and particularly the American parent in the United States. In other words, by their "own deliberate acts, here and elsewhere, [defendants have] brought about results within the United States." *Bulova, supra,* 344 U.S. at 288, 73 S.Ct. at 257.

In *Timberlane III, supra,* 749 F.2d at 1385–1386, the Court found that both parties agreed virtually all the alleged illegal activity had occurred in Honduras and the this element thus weighed against the exercise of jurisdiction. Defendants here argue that their illegal activities did not occur in the United States, but in Mexico. However, the defendants' activities which have occurred within the United States appear as essential steps in defendants' scheme to sell footwear bearing counterfeit copies of the Reebok Trademarks. *See, Bulova, supra, American Sales, supra.* The location of the banks which transfer defendants' moneys to Korea and secure defendants' profits earned from their illicit activities appear within the United States, and more specifically within this District. *American Sales, supra; Wells Fargo, supra.* Most importantly, it appears defendants, offered

in the United States to sell counterfeit REEBOK shoes to a United States resident.

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendants, including Marnatech Enterprises, Inc., Conatech, S.A. De C.V., Nathan Betech, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise, are and shall be preliminarily enjoined and restrained, in the United States and in the Republic of Mexico from:

(i) using plaintiffs' REEBOK Trademarks or plaintiffs' logos or trade name or any reproduction, counterfeit, copy, or colorable imitation of said marks, logos or trade name in connection with the manufacture, importing, exporting, distributing, advertising, offering for sale, or sale of footwear or other items not the products of plaintiffs, or using such marks in any manner likely to cause others to believe that defendants' products are connected with plaintiffs or plaintiffs' genuine REEBOK merchandise; and

(ii) passing off, inducing, or enabling others to sell or pass off any footwear which are not genuine REEBOK products as and for genuine REEBOK products; and

(iii) committing any other acts calculated to cause purchasers to believe that defendants' products are genuine REEBOK products unless they are such; and

(iv) importing, exporting, shipping, delivering, holding for sale, distributing, returning, transferring or otherwise moving or disposing of in any manner shoes falsely bearing one or more of the Reebok Trademarks, plaintiffs' logos or trade dress or any reproduction, counterfeit, copy, or colorable imitation of same; and

(v) moving, destroying, or otherwise disposing of any footwear, molds, labels, beat transfers, screens, printing and/or embroidering devices or other items, merchandise or documents relating to or bearing the Reebok Trademarks or plaintiffs' logos or trade dress of

(vi) removing, destroying, or otherwise disposing of any molding, manufacturing, printing or embroidering or silk screening apparatus, business records or documents relating in any way to the manufacture, importation, exportation, acquisition, purchase, distribution, or sale of goods bearing the Reebok Trademarks or the logos or trade dress of plaintiffs; and it is further

ORDERED, that plaintiffs shall post or maintain a corporate surety bond, cash or a certified or attorney's check in the amount of $15,000 as security, determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure, attempted seizure, or restraint hereunder; and it is further

ORDERED, that the seal of this action was removed and vacated by the Court at the hearing on the Order to Show Cause on September 22, 1989, and the Clerk may remove the seal.